Good morning, Your Honors. Stephen Rennick for Appellants John Van de Kamp and Kurt Livesey. With the Court's permission, I'd like to reserve three minutes for rebuttal. Thank you, Your Honors. I'd like to start off by sort of repeating my introduction because it is relevant here. I am representing Mr. Van de Kamp and Mr. Livesey as individuals. They are not being prosecuted. The plaintiff is seeking to hold them personally liable for actions they took in their roles as the two top officials of the Los Angeles District Attorney's Office. And the issue is simply, am I correct, whether their actions were administrative or prosecutorial when they failed to establish an office-wide policy about how to deal with informants? Yes, though, I quibble about use of the word administrative. And I can quote, Your Honor, back at you from the Demery case where you noted that conduct that is subject to the prosecutorial immunity may be investigative or administrative informant. There are other cases that we have cited that show that. It's not a bright line difference. It goes to the nature of the function that is being engaged in. As the Supreme Court put it, the analysis is whether or not the action is intimately associated with the judicial phase of the criminal process. And there is nothing inherent in that that precludes an arguably administrative act from nonetheless being subject to the It's a long way of getting around to, yes, indeed, that is the issue here, whether or not this arguably administrative inform conduct is nonetheless protected by the absolute prosecutorial immunity. And so you would put the issue differently, then. You would say it's not whether it's administrative or prosecutorial. You would say even though administrative, is it prosecutorial? That's closer. I think what we're experiencing here is the uncertainty of the language. There isn't a bright line test. And so when we try and put any sort of explicit formulation, we begin quibbling. I don't want to fight over that. I think what you just said is reasonably accurate for the purposes of this proceeding. The fact of the matter is that Van de Kamp was the county prosecutor and his chief deputy. Correct. And that there was an obligation at law, i.e. through the Supreme Court, to perform certain conduct within the office, right? Exactly. And there was no defendant to the conduct. The conduct was to organize the office in a manner where all the deputies were aware of the deals that were being cut with prisoners, right? That's certainly what the Supreme Court indicated in the Chief Justice. If that's a fair statement, you can't make a decision as to whether that's administrative or prosecutorial? I don't see an absolute distinction between administrative and prosecutorial, because obviously in format, this is administrative as opposed to to... If it's prosecutorial... Yes. Who got an indictment with respect to this conduct? No one. So there's no prosecution pending, right? Correct. Okay. So it's got to be administrative. Okay. I don't know. Well, to the extent that we're talking in form, yes. But I don't think it's a misuse of the words. I just think it's a fuzzy analysis. I apologize if I'm in that position. Fuzzy is really kind. Well, if I can follow up on what Judge Beezer just said, the whole point is the Supreme Court ordered prosecutorial offices to do this, not because they felt that, gee, we think offices should be run this way. If we had our druthers, we'd tell the Sanitation Department how it was. I'll tell you what I told you to do it, because there's at least one person who's been executed because Mr. Fink lied as an informant, jailhouse informant. They told you to do it because there's nothing more serious than what was going on with Mr. Fink and people like that. I think you've just proven my case, Your Honor. It goes to the core of due process and the whole entire criminal justice process. So does the whole idea of the DA's office. Everything that goes on in the DA's office goes to the core of due process and criminal justice. Some of it's administrative, some of it's prosecutorial. But there's a distinction between telling the clerks how to operate, deciding which prosecutors will be assigned to which Supreme Court said absolutely, positively, must be effectuated in order to make sure that criminal defendants have an opportunity to have a fair trial. They impose this burden on prosecutors because of its impact at the trial level. And they said in order to effectuate that. You know, everything that the DA does, including the examples you gave, have an impact at the trial level. Everything that goes on in the office is designed to result in better trials. But some of the functions, like hiring the counsel, that's an administrative function, who you hire. But it's designed to see that you have a good trial. But there's a difference in where that's coming from. The Supreme Court did not say we want you to have efficient offices. The Supreme Court said that. Whether the Supreme Court said it or not, that doesn't change the nature of the function. Even if the Supreme Court hadn't said this, there would still be a function of setting office policies that's either protected by absolute immunity or not. The problem is, suppose you say I'm not going to hire any blacks because the trials won't be as efficient. That would be designed to get better trials by a bigot who was the district attorney. But it would not be a prosecutorial function. It would be an administrative function. I agree that the line is not crystal clear and that it's not – I didn't say it wasn't crystal clear, except which side of the line this case falls on. That's crystal clear. The concern that I would present to the Court if we adopt this position is that essentially it eliminates the availability of the prosecutorial immunity to any supervisorial officer. Because anything that is – When the supervisor tells the individual DA, this is how I want you to try this case, that's prosecutorial immunity. If Mr. Vandekamp said, look, to the prosecutor, Mr. Goldstein is really an evil man and the future of this office rests on whether you – how you try this case and I'm going to give you some advice and I'm going to give you some help and I'm going to assign a particular investigator to try this case, that all might be directed to prosecuting a particular case. But what if the statement by that – by Mr. Vandekamp, by a supervisor, is not directed towards one particular trial, but a type of trial? Anytime there's a shotgun murder, we want you to try it in this particular manner. Is that not immune because it's not focused on a single prosecution? It's clearly focused on prosecutions of crimes within the scope of the role of a prosecutor as prosecutor. Where do we say suddenly they're not engaging in conduct that affects trials and it's more of a office policy? And I don't think you can draw that sort of line with any sort of coherence that would give any guidance to the supervisorial prosecutorial staff. They're going to spend, if this case goes the way the plaintiff would like, essentially every prosecutor in the Ninth Circuit who isn't in the courtroom or isn't taking steps directly associated with an individual prosecution is going to be looking over his or her shoulder asking, am I going to be sued for this? Because it presents the ability of – But if every DA has to look over his shoulder and say, are the procedures I've established for my prosecutors constitutional and fair, that might be a pretty good thing, wouldn't it? Maybe in theory, but it's in – it's contradicted by the underlying – By DA, I mean the head of the office. No, no, I understand that, but that argument goes all the way down to the line prosecutor. The same – Well, no, you say if we decide this case the way the plaintiffs want, and I say if we do that, wouldn't the result be that every elected DA or every head of the office will say to himself, you know, I have a responsibility to comply with the Constitution and see that our procedures in our office are proper? I think that that, as many cases from this circuit and around the country have said, the mechanism that ensures that prosecutors comply with the law is the ability of the criminal defendant to obtain reversals and to obtain relief. One of the criminal defendants is now dead as a result of the failure to have a policy. Mr. Goldstein spent 24 years in prison as a result of that, assuming, as we do at this stage, that the facts are true. Is there a better way to enforce a policy or to persuade prosecutors to adopt fair policies than Mr. Goldstein's experience and Tommy Thompson's experience? That argument applies just as strongly to the line prosecutor who decides, I really want Mr. Goldstein or Mr. Thomas to be convicted, and I will lie, cheat, steal, withhold evidence, anything like that to get it. You're suggesting we should modify absolute prosecutorial immunity also? I think if the plaintiff wants to make that argument to the Supreme Court, he's entitled, but that's not the situation we have. The Supreme Court has said prosecutorial immunity exists, it's set out what the standard is, and our position is whatever might be the arguable benefits of putting a bright line at the courthouse door saying, beyond this, you're on your own, guys, it's not what is an option for this court. Well, we've taken your, oh, excuse me, Judge Henderson. Well, the Supreme Court has also said that the presumption that qualified immunity is sufficient for administrative duties. What do we do with that? Again, that goes, and I'm sort of contradicting myself, when it's an administrative act, then, of course, the absolute immunity doesn't apply. I am not arguing that conduct that truly is administrative and doesn't apply to the statute of limitations of the statute of limitations, doesn't have anything to do with the judicial phase of the criminal process. Well, but then you obliterate administrative duties. No, not at all. I think there are clear situations, personnel situations, that truly are not within the scope of the absolute immunity. And, you know, where exactly that line is, I know the circuit has dealt with it, and Ceballos and the Supreme Court didn't exactly clear that issue up. But I think it's much clearer when you're dealing with issues that don't impact directly trials. This impacted, this alleged lack of a policy, impacted how evidence was presented to the defense counsel in an individual trial. It may have been a policy not enacted at the very highest levels, but its impact, its purpose, if you will, was in that trial. It wasn't who's going to have which parking spot, who's going to be prosecuting which cases. Those clearly have a step away from the basic issue of prosecution. This doesn't. And I think that with that distinction, it avoids the problems that you're concerned about. I mean, there's always, however we apply immunities, qualified or absolute, there's always going to be a gray area. That's why these issues are constantly coming before this Court and the Supreme Court. And I don't think we'll ever solve that one, because the inventiveness of the human being and finding new ways to come to the edge is endless. But the inventiveness of lawyers in presenting arguments. But you wanted three minutes for rebuttal. I have a question I'd like to get in before I suspend. Do you want to go back to the trial court for any reason at all? Tell me just either way. I want to know both ways. Well, it's currently pending down there as to other defendants, if obviously as to these two individuals, if absolute immunity is applied, they don't go back. But the trial, the case is still active. But if we deny absolute immunity, this goes back and they go to trial with the others, unless you try to come up again on qualified immunity. The two individuals have not. Are there any cost problems or anything else that has to be addressed by the trial court if you do not prevail? I'm sorry. I missed one word you said. Any other issues that have to be addressed by a trial court if you do not prevail? We haven't done any discovery. We haven't, I mean, we basically haven't done anything on the case. So there will be a summary judgment, presumably, in motion, and we'll probably come back up on qualified. Is this a final judgment? This is not a final judgment, is it? No, this is an interlocutory appeal just from the denial of our motion to dismiss. Okay. Thank you. May it please the Court, Ronald Kay on behalf of Mr. Thomas Lee Goldstein, appellee in this case. Your Honors, this is not a gray area. This is a case in which the appellants were involved in administrative conduct, acting as administrators, they ignored the mandate of the United States Supreme Court with regard to Giglio and failed to create a policy, failed to disseminate information throughout the office. The appellant continuously wants to focus on the impact ultimately on the trial phase. This Court found in Milstein v. Cooley that that is not the issue that should be considered. Everything, as Judge Reinhart stated, everything in a prosecutor's office ultimately affects the trial stage. The landmark case of Imler v. Pacman states whether something is intimately, intimately associated with the judicial phase of the criminal process. This does not fall under that heading. The Kalina v. Fletcher focuses on the nature of the function. We are focusing on administration of an office, creation of policies. It's not the intent of the prosecutor. This Court found that in Milstein v. Cooley very clearly. That's not relevant. It's not the impact on the judicial system, which was found in Buckley v. Fitzsimmons. It is the conduct that is at issue. What we have here is a record-keeping system, is a failure to create a record-keeping system, a failure to train individual deputy district attorneys how to share information. Your Honor focused on a man who lost his life, who was executed because of this failed policy. My client lost 24 years of his freedom. But the Los Angeles County Grand Jury focused on 10 years in which this practice was prevalent, specifically condemning the policymaking of the Los Angeles County District Attorney's Office, the largest district attorney's office in the United States. And this conduct not solely affected trials. It also affected investigations. It affects everything when there is a potential use of informant in order to proceed with filing of a case, investigating a case, trying a case. Let me ask you a question out of curiosity. Was there any discussion of qualified immunity during the proceedings thus far? Your Honor, that issue is not yet ripe. Of course, we argued in our pleadings in the district court and before this Court. Qualified immunity is always available to a county official, a government official, to make a determination whether There was no request for qualified immunity in the alternative. No, Your Honor. Not at this juncture. Not in the 12b-6 motion to dismiss phase. Your Honor, the Giglio decision specifically used the terminology of the prosecutor's office. These two men, the district attorney and his chief deputy, were in charge of that office. They were not in the courtroom. They were not, as Judge Reinhart stated, providing any kind of advice to the line DA about how to try a case. They were making decisions, which were partly personnel decisions, partly recordkeeping and filing systems. And ultimately, after the grand jury brought to light the injustice that was occurring, they began to determine, well, we need to create a central index. We need to create something in order to prevent this outrageous unconstitutional activity from occurring. The goal of immunity, prosecutorial immunity in particular, is to prevent the deputy district attorney in the courtroom from being harassed, from preventing him from being a zealous advocate on the part of the state. In this case, the deputy district attorney — Can you think of any cases in which the head of the office would receive absolute immunity? The only way I would foresee that he would receive absolute immunity is if he would intervene on a particular prosecution. If he would focus on quality of evidence in a case. It would possibly be more on the border if the head of the office was not a prosecutor. If the head of the office said, we know that Mr. Fink is an outright liar, we know that he will present perjured testimony, but we decide to use him anyway, that would a little bit be closer, but I would still say that would be administrative, but at least they're focusing on a particular witness. Here, we are talking about a generic type of evidence. And therefore, as in the Gensler case, which this court focused on, where the supervisors were providing specific advice to the deputy district attorney about using perjured testimony of an informant in exchange for immunity. What about if a DA announced a policy of seeking the death penalty in all cases in which a particular weapon was used? Or a particular tactic was used? I would argue, Your Honor, that that would also be administrative, because that is dealing on a generic policy level, rather than on a case-specific level. It is not intimately associated with the judicial phase of a particular case. It is a closer call. It is clearly a closer call, because it's talking with how they're going to perform trials. So it causes, it would cause more of a concern that there's a possibility for immunity, but still, Your Honor, the reason we hold policymakers in check through absolute immunity is because we, as Your Honor stated, we want them to look over their shoulder. We want them to be concerned about what kind of policies they're setting in motion that are going to cause people to lose 24 years of their lives. I don't understand why it's less egregious for a prosecutor to say, just come to my attention that an axe has been used in this case. I want you to seek the death penalty. Why is that less or more egregious than the DA saying, I want you on every case in which an axe is used to use the death penalty? How do you distinguish? Well, I don't think it's a question of whether it's less or more egregious. It's a question of not wanting to interfere with the prosecutor's ability to, or his supervisor's ability to guide the prosecutor's decision. It's a question of not wanting to interfere with the prosecutor's ability to guide the direction of a particular prosecution. If we should sue the DA, then we should sue the prosecutor. Isn't he doing it in both? He's doing it in all categories of axe cases. What's the difference is what I'm asking. My view, Your Honor, is that we want the policymaker to be held accountable if he's making a broad brush unconstitutional assessment that is contrary to law. We don't want him to feel harassed or inhibited by an onslaught of litigation and liability if it's dealing with a particular case. We as a society, we want to preserve district attorney's ability to zealously advocate for the state. We want to not allow, force those in the courtroom to be worried that they're going to be held accountable. That's why a prosecutor in the courtroom who uses perjured testimony is still immune. As tragic as that may seem, he's still immune because we don't want him burdened with litigation. But when the policymaker is setting in motion a system in which outrageous unconstitutional activity continues on a case-by-case basis, which is exactly what happened here, and established through the Los Angeles County Grand Jury, that this is so far from a isolated incident, and if there was any institution in the United States that was under an obligation to take into account the mandate of Giglio versus the United States, it was the Los Angeles County District Attorney's Office, because they are the largest one. They are the ones most prone to potential corruption in the use of evidence. The — and the problem also, Your Honor, is that this can never be remedied in the courtroom. In this case, what — the deal that was given to Mr. Fink, based on the policy of Mr. Vandekamp and Mr. Livesay, could never be cured. There's not a public defender. There's not a superior court judge who can go and go to bat for Mr. Goldstein and say, this is problematic. Cross-examination would not be effective, necessarily, because no one in that courtroom knew that Mr. Fink was lying and perjuring himself when he said he received no benefits. This is exactly the type of conduct that warrants liability for policymakers. And, Your Honor, I believe my time is up, but I — the liability for these two cases, the liability for the two individuals in their role, is a just act. It's not a slippery slope. It's a just act that is what 1983 was created in order to protect individuals who are victims of unconstitutional conduct. Thank you. All right. We'll give you your three minutes rebuttal. Thank you, Your Honor. I just have, basically, one quick comment. Judge Henderson asked the question about the case, why it would be more or less egregious for the district attorney to say, we're going to prosecute on this one individual case because of the use of an ax versus a whole class. And counsel's response is, we want the DA accountable for his policies. We want the DAs to be able to advocate zealously. But that applies to the district attorney in making policies regarding how cases are going to be prosecuted. We want the district attorneys, elected officials, being constrained in their ability to decide how they are going to prosecute cases, whether individual cases or entire classes of cases, by the fear that they're going to be sued for it. They may be thrown out of office for it if their policy is found to be contrary to what the public wants. But if they make a decision that, as a prosecutor, I want the prosecutors under my supervision to prosecute on this case, I want to prosecute particular cases in a particular way, that is worthy of protecting, just as much as the individual line deputy's decision to prosecute an individual case in a particular way. And I would argue that this lack of policy goes directly to that, the decision whether or not to provide information about plea deals to defense counsel, which absolutely was required by Jiglio, it goes to how cases, an entire class of cases, essentially everything, would be prosecuted. It's not an administrative policy. It's prosecutorial at its very core. It goes to how cases are going to be prosecuted. Would you make a distinction between making such a decision as you've just described and simply failing to make a decision, failing to run an office efficiently? Is there a difference in those two things? Well, failing to run an office efficiently, I think, is truly an administrative issue. But failing to enact a policy, in order to decide whether or not that was neglect or a specific policy decision, I think, is an administrative issue. It requires you to go into the underlying facts, the decision-making, in other words, to have a lawsuit. The whole purpose of absolute immunity is immunity from suit. To not go into that, to not ask the line prosecutor, why did you not give this information to the other side? The same concern, the same policy reason applies. No, why did you not adopt a policy regulating the use of informants, or requiring training officers, deputies, about what to do about the kind of giglio problems? The issue hasn't come up yet. This was a motion to dismiss. We were acting, you know, the cases. No, no, but the question is whether the failure to adopt those policies would be administrative. Not if it was a conscious decision. If the district attorney said, to hell with the Supreme Court, I'm going to adopt this policy. That's no different than a line deputy saying, I don't like Brady. I'm not giving him the information. It's as much of a prosecutorial decision as any other. The only way to answer the question of whether it was a conscious, deliberate decision versus simply a screw-up is to actually litigate the case, but that's not what absolute immunity is all about. We don't go into motivation, reasons, facts. It's if it fits into the class, you get the get-out-of-jail-card free. Wrong as that may seem in certain situations, and that comment is found throughout the cases, that the impact of absolute immunity is that deserving plaintiffs may not get their day in court, but the overall public policy underlying the immunity has been found to be of such benefit that we will tolerate those occasional injustices. Is your best case for a general policy by the head of an office, the Roe case? As far as a specific case dealing with an overall policy, yes. There are comments in other cases about administrative and investigative acts applying, but as far as I know, that's the only one that explicitly addressed what could be called a pre-prosecution policy. And that was just a policy whether to use one individual in cases? Yes. All right. Thank you, counsel. Thank you for giving me extra time, Your Honors. Thank you both. Case just argued will be submitted. Next case for oral argument is Total Coverage v. Sendon Settlement Services Group.
judges: Reinhardt, Beezer, Henderson